**UNITED STATES DISTRICT COURT**          **EASTERN DISTRICT OF TEXAS**

DARWIN DURISSEAU,                          §
                                           §
                        Plaintiff,         §
                                           §
*versus*                                   §   CIVIL ACTION NO. 1:22-CV-432
                                           §
UNION TANK CAR COMPANY,                    §
                                           §
                        Defendant.         §

## MEMORANDUM AND ORDER

Pending before the court is Defendant Union Tank Car Company's ("Union Tank Car")
Motion for Summary Judgment (#21).  Plaintiff Darwin Durisseau ("Durisseau") filed both a
response in opposition (#36) and a separate response to Union Tank Car's statement of undisputed
material facts (#37), and Union Tank Car filed a reply (#38).  Having considered the pending
motion, the submissions of the parties, the record, and the applicable law, the court is of the
opinion that Union Tank Car's motion should be granted.

I.     Background

On July 5, 2022, Durisseau filed his Original Petition (#1-1) in the 284th Judicial District
Court of Montgomery County, Texas.  On September 2, 2022, Union Tank Car removed the case
to the United States District Court for the Southern District of Texas on the basis of diversity
jurisdiction.  Upon the parties' agreement, United States District Judge Lynn N. Hughes of the
Southern District of Texas transferred the matter to this court on October 6, 2022 (#8).

In his Original Petition, Durisseau alleges that he sustained injuries in an incident that
occurred on November 20, 2020, in Cleveland, Texas, during the course and scope of his
employment by Union Tank Car.  At the time, Durisseau was employed as a "switchman" for

Union Tank Car, a company that is "engaged in the repair, maintenance, ownership, and leasing of railcars." Specifically, Durisseau claims that he was standing on the "grading" of a tank car when the "grading" suddenly flipped, throwing Durisseau to the ground and injuring him.

Durisseau asserts a cause of action against Union Tank Car for negligence under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51. In its pending motion, Union Tank Car contends that, as a matter of law, it is not a "common carrier" and thus cannot be held liable under the FELA. After granting Durisseau two continuances to permit him time to conduct additional discovery under Federal Rule of Civil Procedure 56(d), the court denied Durisseau's third motion for continuance on December 7, 2023, and directed Durisseau to respond to Union Tank Car's summary judgment motion on or before December 14, 2023. Upon consideration of Durisseau's response, the court concludes that Durisseau fails to adduce any competent summary judgment evidence that raises a genuine dispute of material fact as to whether Union Tank Car is a common carrier covered by the FELA.[1]

---

[1] Union Tank Car argues that the court should disregard Durisseau's response brief and his separate response to Union Tank Car's Statement of Undisputed Material Facts as untimely filed. Union Tank Car correctly notes that the court's Memorandum and Order denying Durisseau's third motion for a continuance directed Durisseau to file his response on or before December 14, 2023. According to the electronic filing system, Durisseau filed his response brief on December 15, 2023, at 12:01 a.m. and his response to Union Tank Car's Statement of Undisputed Material Facts on December 15, 2023, at 9:29 a.m. Although Durisseau fails to provide an explanation for his untimely filings, given that he filed the documents at issue within minutes and hours of his deadline, the court exercises its discretion to consider his responses. *See James v. Cleveland Sch. Dist.*, No. 4:18-CV-66-DMB-RP, 2021 WL 1988197, at *1 (N.D. Miss. May 18, 2021) ("[E]ven in the absence of excusable neglect, a court has discretion to consider an untimely filing." (citing *Farina v. Mission Inv. Tr.*, 615 F.2d 1068, 1076 (5th Cir. 1980))); *see also Pitzen v. Woods*, No. 23-641, 2023 WL 3221969, at *1 (E.D. La. May 3, 2023) (exercising discretion to consider a response brief filed three days late).

II.    Analysis

A.    Summary Judgment Standard

A party may move for summary judgment without regard to whether the movant is a claimant or a defending party.  *See Union Pac. R.R. Co. v. Palestine*, 41 F.4th 696, 703 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 579 (2023); *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 380 (5th Cir. 2019); *Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789, 793 (5th Cir. 2010).  Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Union Pac. R.R. Co.*, 41 F.4th at 703; *United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Anderson*, 9 F.4th 328, 331 (5th Cir. 2021); *Smith v. Harris County*, 956 F.3d 311, 316 (5th Cir. 2020); *Parrish*, 917 F.3d at 378; *Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016).   The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022); *Goldring v. United States*, 15 F.4th 639, 644-45 (5th Cir. 2021); *Playa Vista Conroe v. Ins. Co. of the W.*, 989 F.3d 411, 416-17 (5th Cir. 2021); *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019).

"A fact issue is 'material' if its resolution could affect the outcome of the action." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015) (quoting *Burrell*

*v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)), *cert. denied*, 578 U.S. 945 (2016); *see MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Lexon Ins. Co., Inc. v. Fed. Deposit Ins. Corp.*, 7 F.4th 315, 321 (5th Cir. 2021); *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020).   "Factual disputes that are irrelevant or unnecessary will not be counted." *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *accord Valencia v. Davis*, 836 F. App'x 292, 296 (5th Cir. 2020); *see Dyer*, 964 F.3d at 379; *Parrish*, 917 F.3d at 378.   "An issue is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Gerhart v. Barnes*, 724 F. App'x 316, 321 (5th Cir. 2018) (quoting *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)), *cert. denied*, 139 S. Ct. 1239 (2019); *accord Johnson v. City of San Antonio*, No. 22-50196, 2023 WL 3019686, at *6 n.7 (5th Cir. Apr. 20, 2023); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019).   Thus, a genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hefren*, 820 F.3d at 771; *accord MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 F.4th 301, 309 (5th Cir. 2021); *Dyer*, 964 F.3d at 379; *Tiblier*, 743 F.3d at 1007.

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to demonstrate the existence of a genuine issue for trial.  *Celotex Corp.*, 477 U.S. at 322 n.3; *see Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting FED. R. CIV. P. 56(e)); *Flowers v. Wal-Mart Inc.*, 79 F.4th 449, 452 (5th Cir. 2023); *MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Clark v. CertainTeed Salaried Pension Plan*, 860 F. App'x 337, 340-41 (5th Cir.

2021); *Acadian Diagnostic Lab'ys, L.L.C. v. Quality Toxicology, L.L.C.*, 965 F.3d 404, 410 (5th Cir. 2020). The court "should review the record as a whole." *Black v. Pan Am. Lab'ys, LLC*, 646 F.3d 254, 273 (5th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)); *see Hacienda Recs., L.P. v. Ramos*, 718 F. App'x 223, 234 (5th Cir. 2018); *City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014). All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves*, 530 U.S. at 150; *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 476 (5th Cir. 2022); *Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021); *Lyons v. Katy Ind. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020). The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in his favor. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson*, 477 U.S. at 255); *Seigler*, 30 F.4th at 476; *Batyukova*, 994 F.3d at 724; *Lyons*, 964 F.3d at 302.

Furthermore, the court's obligation to draw reasonable inferences "does not extend so far as to allow a wholly 'unreasonable inference' or one which amounts to 'mere speculation and conjecture.'" *Mack v. Newton*, 737 F.2d 1343, 1351 (5th Cir. 1984) (quoting *Bridges v. Groendyke Transp., Inc.*, 553 F.2d 877, 879 (5th Cir. 1977)); *accord McGill v. BP Expl. & Prod., Inc.*, 830 F. App'x 430, 432 (5th Cir. 2020); *Batyukova*, 994 F.3d at 724 ("'Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation' will not survive summary judgment." (quoting *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016))); *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 528 (5th Cir. 1999) ("If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in its favor, and summary judgment should be granted." (quoting *Eastman Kodak Co. v.*

*Image Tech. Servs., Inc.*, 504 U.S. 451, 468-69 (1992))); *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 779 (E.D. Tex. 2008) ("[O]nly reasonable inferences in favor of the nonmoving party can be drawn from the evidence." (citing *Eastman Kodak Co.*, 504 U.S. at 468 n.14)). "[S]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 256 (5th Cir. 2020) (quoting *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012)); *accord Allaudin v. Perry's Rests., Ltd.*, 805 F. App'x 297, 299 (5th Cir. 2020); *Acadian Diagnostic Lab'ys, L.L.C.*, 965 F.3d at 410 (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Heath v. Elaasar*, 763 F. App'x 351, 354 (5th Cir. 2019).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *Lyons*, 964 F.3d at 302; *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 560 (5th Cir. 2019); *Tiblier*, 743 F.3d at 1007; *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013). "[W]here the nonmoving party fails to establish 'the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' no genuine issue of material fact can exist." *Goode v. Greenstream Int'l, L.L.C.*, 751 F. App'x 518, 521 (5th Cir. 2018) (quoting *Nichols v. Enterasys Networks, Inc.*, 595 F.3d 185, 188 (5th Cir. 2007)); *see Phillips v. Sanofi U.S. Servs. (In re Taxotere (Docetaxel) Prods. Liab. Litig.)*, 994 F.3d 704, 710 (5th Cir. 2021); *Apache Corp.*, 626 F.3d at 793. In such a situation, "'[a] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial' and 'mandates the

entry of summary judgment' for the moving party." *Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018) (quoting *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir.), *cert. denied*, 555 U.S. 1012 (2008)), *cert. denied*, 139 S. Ct. 2690 (2019); *accord Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 750 (5th Cir. 2023); *Stingley v. Watson Quality Ford*, 836 F. App'x 286, 288 (5th Cir. 2020).

B.    The FELA

The FELA renders common carrier railroads liable in damages to employees who suffer work-related injuries caused by the railroad's negligence.  45 U.S.C. § 51; *see BNSF Ry. Co. v. Loos*, 586 U.S. ___, 139 S. Ct. 893, 900 (2019) (quoting *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 404 (2017)); *Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 144-45 (2003); *Gray v. Ala. Great S. R.R. Co.*, 960 F.3d 212, 215 (5th Cir. 2020) (citing *Rivera v. Union Pac. R.R. Co.*, 378 F.3d 502, 507 (5th Cir. 2004)), *cert. denied*, 141 S. Ct. 1386 (2021).  Congress enacted the FELA in 1908 to "shif[t] part of the human overhead of doing business from employees to their employers."  *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691 (2011) (quoting *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542 (1994)); *see Bohannon v. Kan. City S. Ry. Co.*, 604 F. Supp. 3d 389, 393 (W.D. La. 2022).  "The FELA allows an injured railroad employee to recover damages for 'injury or death resulting in whole or in part from the negligence' of the railroad." *Gray*, 960 F.3d at 215 (quoting 45 U.S.C. § 51); *accord Ayers*, 538 U.S. at 144-45.  The FELA, which departs from the common law principles of liability, was enacted in "response to the special needs of railroad workers who are daily exposed to the risks inherent in railroad work and are helpless to provide adequately for their own safety."  *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 258 (6th Cir. 2001) (quoting *Aparicio v. Norfolk & W. Ry. Co.*, 84 F.3d 803, 807 (6th

7

Cir. 1996), *abrogated on other grounds by Reeves*, 530 U.S. at 133); *see Bratton v. Kan. City S. Ry. Co.*, No. 13-3016, 2015 WL 403150, at *3 (W.D. La. Jan. 28, 2015) (quoting *Sinkler v. Mo. Pac. R.R. Co.*, 356 U.S. 326, 329 (1958)).  In order to prevail under the FELA, a plaintiff must prove that:  (1) the defendant is a common carrier railroad engaged in interstate commerce; (2) the plaintiff was employed by the defendant and was assigned duties in furtherance of such commerce; (3) he sustained injuries while he was so employed; and (4) his injuries were the result of the defendant's negligence.  *See Kellar v. Union Pac. R.R. Co.*, No. 21-2045, 2024 WL 68258, at *2 (E.D. La. Jan. 5, 2024) (quoting *Weaver v. Mo. Pac. R.R. Co.*, 152 F.3d 427, 429 (5th Cir. 1998)); *Lopez v. Union Pac. R.R. Co.*, No. DR-21-CV-33-AM/VRG, 2023 WL 3681715, at *2 (W.D. Tex. Mar. 31, 2023); *Morris v. Gulf Coast Rail Grp., Inc.*, 829 F. Supp. 2d 418, 423 (E.D. La. 2010).

In the case at bar, Union Tank Car asserts that Durisseau has no evidence to support the first element of the FELA analysis—that Union Tank Car is a "common carrier."  Under the FELA, the term "common carrier" encompasses "the receiver or receivers or other persons or corporations charged with the duty of the management and operation of the business of a common carrier."  45 U.S.C. § 57.  The United States Supreme Court has defined a "common carrier by railroad" to mean "one who operates a railroad as a means of carrying for the public . . . ."  *Edwards v. Pac. Fruit Express Co.*, 390 U.S. 538, 540 (1968) (quoting *Wells Fargo & Co. v. Taylor*, 254 U.S. 175, 187 (1920)).  In addition, the United States Court of Appeals for the Fifth Circuit has described a "common carrier" as

> one who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation, offering his services to the public generally.  The distinctive characteristic of a common carrier is that

he undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant.

*Huntley v. Bayer MaterialScience, L.L.C.*, 452 F. App'x 453, 456 (5th Cir. 2011) (quoting *Lone Star Steel Co. v. McGee* ("*Lone Star*"), 380 F.2d 640, 643 (5th Cir.), *cert. denied*, 389 U.S. 977 (1967)).

1.    Precedent Regarding "Activities and Facilities . . . Used in Conjunction with Railroads"

In its summary judgment motion, Union Tank Car first emphasizes that the Supreme Court has made clear that "there exist a number of activities and facilities which, while used in conjunction with railroads and closely related to railroading, are yet not railroading itself." *Edwards*, 390 U.S. at 540.  In *Edwards*, the Court held that a company that owned, maintained, and leased refrigerator cars to railroads was not a common carrier under the FELA, despite "perform[ing] some railroad functions" and owning buildings, plants, and switching tracks for the purpose of making repairs to its cars.  *Id.* at 538-39, 543.  Here, Union Tank Car argues that it is similarly not a common carrier under the FELA because its business of leasing, maintaining, and repairing railcars is analogous to the refrigerator-car company in *Edwards*.  Indeed, as Union Tank Car points out, in *Sampson v. GATX Corp.*, the Fifth Circuit rejected the plaintiff's argument that the holding in *Edwards* was limited to the "niche industry" of refrigerator cars, opining that the plaintiff "provide[d] no principled reasoning as to why the basic analysis of *Edwards* should not apply also to companies like [the defendant] that lease railcars generally."  547 F. App'x 369, 375 (5th Cir. 2013).[2]

---

[2] Durisseau emphasizes that *Sampson*, as an unpublished case, is not controlling.  Nevertheless, Durisseau fails to cite any authority that renders *Sampson* inapposite.  More importantly, Durisseau provides no legitimate reason why *Edwards*, which is binding authority, does not control the case at bar.

In response, Durisseau does not controvert Union Tank Car's evidence that its business consists of leasing, maintaining, and repairing railcars.  Instead, Durisseau asserts that the case at bar is "materially different" from *Edwards* because Union Tank Car's railcar business is "highly regulated" by the Federal Railroad Administration ("FRA") under 49 C.F.R. §§ 173, 174, 179, 180, 231.[3]  In addition, Durisseau cites a United States Court of Appeals for the District of Columbia Circuit case for the proposition that railroads "commonly lease railcars both from firms in the business of supplying railcars and, occasionally, from shippers themselves," and such leasing arrangements enable railroads to "fulfill their common-carrier obligation to make available suitable railcars . . . ." *Gen. Am. Transp. Corp. v. Interstate Com. Comm'n*, 872 F.2d 1048, 1050 (D.C. Cir. 1989), *cert. denied*, 493 U.S. 1069 (1990).  Despite acknowledging that *General American Transportation Corp.* neither mentioned nor implicated the FELA—instead, the case involved an entirely unrelated administrative law matter—Durisseau argues that it nevertheless demonstrates that the business of leasing railcars is a "rail service" because such leasing "operates as a necessary predicate to transporting specialty goods by rail."

Durisseau fails, however, to provide any support for his contentions that an entity is rendered a common carrier under the FELA merely because it is subject to FRA regulations or its leasing services are essential to the business of common carriers.  Although Durisseau contends that he has raised "principled reason[s]" as to why *Edwards* should not apply to the present case, *Sampson*, 547 F. App'x at 375, he fails to cite any authority demonstrating that courts consider

---

[3] As part of his effort to demonstrate that the FRA "exercise[s] authority" over Union Tank Car, Durisseau provides a website link to a document denoting the FRA's authorization of "the use of an Alternative Inspection and Test Program" for Union Tank Car.  *See* U.S. DEP'T OF TRANSP. FED. R.R. ADMIN., *FRA-AIP 200203-02* (Oct. 7, 2020), https://railroads.dot.gov/sites/fra.dot.gov/files/2022-04/UTLX%20FRA-AIP200203-02revA%20Signe d%20Final%20100720.pdf.

the applicability of certain FRA regulations[4] or the need for an entity's leasing services when determining whether that entity is a common carrier.  The court is accordingly unpersuaded by Durisseau's attempts to distinguish *Edwards*.[5]  Thus, applying *Edwards* to the present case, Union Tank Car's business of leasing, maintaining, and repairing railcars does not constitute the activity of a common carrier under the FELA.

2.    The *Lone Star* Analysis

Union Tank Car further asserts that Durisseau cannot present evidence to establish that it is considered a common carrier under the Fifth Circuit's *Lone Star* framework.  In *Lone Star*, the Fifth Circuit identified four "considerations" that it deemed "of prime importance" in determining whether a particular entity is a common carrier:

> (1) actual performance of rail service; (2) the service being performed is part of the total rail service contracted for by a member of the public; (3) the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, and hence is deemed to be holding itself out to the public; and

---

[4] Notably, the FRA does not exclusively regulate railcars.  In other words, the mere fact that railcars are regulated by the FRA does not distinguish them from the refrigerator cars at issue in *Edwards*. The court observes that 49 C.F.R. § 215, which contains regulations governing Railroad Freight Car Safety Standards, explicitly applies to "refrigerator cars."  *See* 49 C.F.R. § 215.1 ("This part prescribes minimum Federal safety standards for railroad freight cars."); *id.* § 215.5(c)(2) ("Railroad freight car . . . includes a . . . Refrigerator car . . . .").

[5] Durisseau also insists that the analysis of whether an entity is a common carrier under the FELA depends upon the scope of the entity's activities as a whole, and not just its activities at the particular facility where the employee was injured.  Thus, Durisseau argues, Union Tank Car's evidence regarding its activities in its Cleveland facility "is hardly probative" of the entity's "operations as a whole." Durisseau, however, presents no evidence regarding Union Tank Car's operations at other facilities, much less demonstrating that it engages in activities elsewhere that constitute operating as a common carrier. Thus, Durisseau's argument on this point is unavailing, as mere "speculation" and "unsubstantiated assertions" are insufficient to survive summary judgment.  *Batyukova*, 994 F.3d at 724.

11

(4) remuneration for the services performed is received in some manner, such as a fixed charge from a railroad or by a percent of the profits from a railroad.

*Huntley*, 452 F. App'x at 457 (quoting *Lone Star*, 380 F.2d at 647).

a.   Actual Performance of Rail Service

Regarding *Lone Star*'s first prong, Union Tank Car asserts that Durisseau cannot demonstrate that it performs "rail service" that renders it a common carrier.  In support of this assertion, Union Tank Car relies upon Cleveland Plant Manager Duane Stephenson's ("Stephenson") declaration (#21-1), which describes Union Tank Car's operations.  Specifically, Stephenson explains that Union Tank Car leases its railcars to private companies, such as Dow Chemical, Archer Daniels Midland, Exxon Petroleum, and Eastman Chemical, and these lessees then "use common carrier railroads to ship their products contained in railcars."  When the leased railcars require repairs, the "servicing railroad," BNSF Railway ("BNSF"), "transport[s] and deliver[s] empty railcars to an inbound rail track" that is privately owned by Union Tank Car.  After Union Tank Car's employees "use equipment to pull the railcars into the plant," the employees use "Union Tank Car's limited and privately owned and maintained length of rail track" inside its facility to move the railcars to different locations "for inspection, repair, testing, painting, etc."  Once the repair work is completed, employees place the empty railcars on Union Tank Car's outbound rail track so that BNSF may retrieve them.  Thus, Union Tank Car argues, it does not perform "rail service" beyond moving railcars for repair and maintenance purposes within its privately-owned facility.

Importantly, as Union Tank Car points out, courts have held that rail service that is conducted as part of an entity's internal plant operations or is otherwise incidental to an entity's business does not render the entity a common carrier.  *See Lone Star*, 380 F.2d at 644, 648

12

(holding that, while "[c]ourts have long recognized the distinction between plant facilities and 'true agencies of transportation,'" the defendant had "gone beyond the permissible bounds of what is allowed in operating an intraplant rail system as a plant facility" because it "adopted the regular practice of transporting for others"); *see also Huntley*, 452 F. App'x at 456 (explaining that "a company that maintains a 'plant facility,' i.e., 'a complicated intra-plant railroad system' by which the company moves its own goods and does not offer the railroad's use to the public, is not a common carrier" (quoting *Lone Star*, 380 F.2d at 644)); *McCrea v. Harris Cnty. Hous. Ship Channel Navigation Dist.*, 423 F.2d 605, 609 (5th Cir. 1970) (upholding the district court's reasoning that "the movement of rail cars over a few hundred feet of track" in order to unload cargo is "not a rail service").  In other words, Union Tank Car's movement of railcars on its internal rail system solely to perform repairs constitutes intraplant activity that is markedly distinct from the operations of "transporting for others" as a common carrier.  *Lone Star*, 380 F.2d at 648.  Indeed, Union Tank Car's operations fall neatly within the Supreme Court's description of "activities and facilities which, while used in conjunction with railroads and closely related to railroading, are yet not railroading itself."  *Edwards*, 390 U.S. at 540.

Durisseau's only arguments regarding the first consideration of the *Lone Star* analysis are his aforementioned assertions that Union Tank Car's leasing of railcars should be viewed as distinct from the company that owned, maintained, and leased refrigerator cars in *Edwards*.  Durisseau produces no evidence in support of his argument that Union Tank Car performs "actual rail service."  Accordingly, to the extent Union Tank Car's operations within its private facility constitute "rail service," Durisseau offers no evidence or authority suggesting that Union Tank

Car's rail service exceeds the bounds of intraplant activity or is otherwise akin to that of a common carrier.

> b.  The Service Performed Is Part of the Total Rail Service Contracted for by a Member of the Public

Union Tank Car next contends that its activities of leasing, maintaining, and repairing railcars for its private customers do not involve performing "rail service" that is "contracted for by a member of the public" under the second prong of the *Lone Star* analysis.  380 F.2d at 647. Union Tank Car maintains that it is not involved in transporting either individuals or cargo for members of the public, emphasizing that its railcars are empty when they arrive at and depart from the Cleveland facility.  Moreover, as Stephenson averred in his declaration, Union Tank Car's private customers "are not billed for the movement of cars incidental to repair and maintenance work undertaken by Union Tank Car."  Stephenson also confirmed that Union Tank Car "has never held itself out to the public as being engaged in the business of transportation of persons or property from one place to another in exchange for compensation."

In other words, none of the movements of the railcars on Union Tank Car's private tracks in its private facility are "being performed as part of total rail services" that a railroad or Union Tank Car "has contracted with the public to perform."  *Mahfood v. Cont'l Grain Co.*, 718 F.2d 779, 782 (5th Cir. 1983); *see Huntley*, 452 F. App'x at 458 (concluding that a private entity did not perform rail services that had been contracted for by a member of the public where the entity's customers "[did] not receive [the entity's] services by virtue of their shipment contracts with Union Pacific and BNSF").  Instead, Union Tank Car uses its private, internal rail system solely to effect repairs to its railcars, which are leased to private customers.

Union Tank Car further asserts that, although it maintains its own inbound and outbound tracks that BNSF uses to transport railcars to and from its Cleveland facility, the Fifth Circuit has held that such physical connections with a railroad do not transform an entity into a common carrier. *See Huntley*, 452 F. App'x at 454, 460 (holding that the entity, which housed a location where two railroads "enter[ed] [its] Facility, 'couple[d] up' with the rail cars, and [took] them to their final destination" was not a common carrier); *see also id.* at 459 (reasoning that the fact that the entity leased sections of track outside its facility from common carriers was "immaterial" because its "right to use a portion of the track . . . w[as] merely for the convenience of the plants [within the facility] and in no way furthered the contractual obligations of the common carrier" (quoting *Kieronski v. Wyandotte Terminal R.R. Co.*, 806 F.2d 107, 109-10 (6th Cir. 1986))).

Durisseau argues, however, that Union Tank Car's operations constitute part of the "total rail service contracted for" by the public because Union Tank Car provides "full-service" leases to its customers, including performing "qualifications" for its tank cars, in compliance with federal regulations. Durisseau relies upon portions of Stephenson's deposition, as well as Union Tank Car's website, as evidence that Union Tank Car performs such services. Durisseau fails, however, to cite any authority for the proposition that complying with the federal regulations governing railcars constitutes performing "rail service" that is contracted for by the public. Indeed, as Union Tank Car points out, the Fifth Circuit held in *Sampson* that a company that similarly "lease[d] and maintain[ed]" railcars did not engage in the "actual performance of rail service." 547 F. App'x at 375-76. As a result, the record is devoid of evidence that Union Tank Car performs "rail service" that is "contracted for by a member of the public" under the second prong of the *Lone Star* analysis.

15

  c. <u>Performing as Part of a System of Interstate Rail Transportation by Virtue of Common Ownership or a Contractual Relationship with a Railroad</u>

Turning to *Lone Star*'s third consideration—whether "the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, and hence such entity is deemed to be holding itself out to the public"—Union Tank Car's motion does not address the "common ownership" or "contractual relationship" aspects of this prong. 380 F.2d at 647.  Instead, Union Tank Car asserts that its interactions with BNSF of receiving and returning its railcars do not make it part of BNSF's "interstate operation."  As support for this assertion, Union Tank Car cites Stephenson's statement that Union Tank Car's "limited private rail track is not used to serve the public" and any "switching"—or movement of railcars inside its plant—"is done incidentally to Union Tank Car's repair services solely within the confines of private rail yards."  Additionally, Union Tank Car relies upon Stephenson's observation that Union Tank Car's Plant Railway Switching Safety Rule Book clearly distinguishes its employees' work from that of common carriers, explicitly stating:  "Plant Railways do not operate by the same standards as Common Carrier Railroads."

In contrast, Durisseau focuses exclusively on the "common ownership" component of *Lone Star*'s third prong.  Specifically, Durisseau maintains that this prong is satisfied because "Union Tank [Car] shares common ownership with BNSF, through Berkshire Hathaway" and "Berkshire Hathaway asserts control over both Marmon Holdings, and Union Tank [Car]."  The only evidence that Durisseau cites to support this assertion is Union Tank Car's Corporate Disclosure Statement (#3), which provides:  "Union Tank Car Company, through a series of relationships

16

between additional privately held companies, is a wholly owned subsidiary of Marmon Holdings, Inc., a privately held company.  Marmon Holdings, Inc.[,] is a wholly owned subsidiary of Berkshire Hathaway Inc., a publicly traded company." Notably, Union Tank Car's corporate disclosure statement omits any mention of BNSF, and Durisseau fails to provide any evidence demonstrating a purported connection between BNSF and Berkshire Hathaway.

Even if Durisseau had elicited evidence establishing such a corporate connection between Union Tank Car and BNSF, he nonetheless falls short of establishing that such "common ownership" results in Union Tank Car's "performing as part of a system of interstate rail transportation" or "holding itself out to the public," as is required under the third prong of *Lone Star*. *Id.* In its reply brief, Union Tank Car emphasizes that, as Stephenson explained in his deposition testimony, its customers contract separately with BNSF to deliver Union Tank Car's railcars to the Cleveland facility for repairs.  This, according to Union Tank Car, is the "sole link" between its operations and BNSF.  Union Tank Car further insists that it and BNSF "are controlled by separate management and do not share employees or otherwise collaborate in one another's businesses."  Additionally, Union Tank Car relies upon Stephenson's statement that Union Tank Car "does not serve its customers by transporting persons or cargo, and does not engage in any other transportation activity" as evidence that it neither "perform[s] as part of a system of interstate rail transportation" nor "hold[s] itself out to the public" as a common carrier. Durisseau produces no evidence to the contrary.

Indeed, a closer examination of the Fifth Circuit's analysis in *Lone Star* reveals that mere common ownership is insufficient to establish the third prong.  Importantly, the Fifth Circuit noted its general "agree[ment] with [the] proposition" that "stock ownership does not make the two

companies one." *Id.* at 648.  The court determined, however, that *Lone Star* did not "present a case of mere stock ownership" because the operations of the entity defendant and Texas & Northern Railway Company ("T&N") were "highly integrated and mutually dependent." *Id.*  In particular, the court was persuaded by evidence that, in addition to being "virtually the sole stockholder of T&N," the entity defendant was "undertaking the obligations of a common carrier" by "regularly shuttling the goods of other business concerns" and thus "performing a part of the total rail services which another railroad, T&N, has obligated itself to perform." *Id.* at 643, 646.

In the case at bar, Durisseau's scant evidence of common ownership is a far cry from the overwhelming proof in *Lone Star* that the entity defendant's operations were "highly integrated and mutually dependent" upon a common carrier.  *Id.* at 648.  No evidence indicates that Union Tank Car either "perform[s] as part of a system of interstate rail transportation" or "hold[s] itself out to the public" under the third consideration of *Lone Star*.

> d.     Remuneration from a Railroad in the Form of Fixed Charges or a Percent of Profits

Finally, Union Tank Car argues that Durisseau cannot adduce any evidence demonstrating that it receives "remuneration for the services performed . . . such as a fixed charge from a railroad or by a percent of the profits from a railroad," in order to meet the fourth prong of the *Lone Star* test.  *Id.* at 647.  Importantly, Fifth Circuit precedent indicates that *Lone Star*'s fourth prong is not satisfied merely by an entity's receipt of compensation from a railroad; rather, the railroad must provide the entity with "direct[ ] or indirect[ ] remuneration for [the entity's] *rail services*."  *Mahfood*, 718 F.2d at 782 (emphasis added).  Such remuneration may be in the form of "fixed charges or . . . dividends from a subsidiary for which [the entity] fulfills rail services."

*Id.*  Union Tank Car emphasizes that it does not receive "compensation for providing rail service from its Cleveland plant."

In response, Durisseau relies upon a website link to the Securities and Exchange Commission's ("SEC") archives that contains BNSF's Proxy Statement from 2009.[6]  Specifically, Durisseau directs the court's attention to the following excerpt:  "In 2008, [BNSF] . . . paid Union Tank Car approximately $2,700,000 for railcar leasing and related services.  We provide transportation services to certain subsidiaries of Berkshire, including . . . Union Tank Car Company.  In 2008, we earned revenues of approximately . . . $1,800,000, respectively, for transportation services provided to these companies."  Durisseau contends that this evidence establishes that Union Tank Car "has, in fact, leased railcars to BNSF . . . in the past."

As Union Tank Car points out, Durisseau's evidence does not demonstrate that it received remuneration for "rail service."  Rather, BNSF specifically paid Union Tank Car for "railcar leasing and related services," and the Fifth Circuit has explicitly held that leasing railcars does not constitute operating as a common carrier.  *Sampson*, 547 F. App'x at 375-76.  Furthermore, the compensation that Union Tank Car received from BNSF in 2008 was not in the form of a "fixed charge" or "dividends."  *Mahfood*, 718 F.2d at 782.  Moreover, even if the compensation described in BNSF's 2009 Proxy Statement was of the type referenced in *Lone Star*, the mere fact

---

[6] Union Tank Car contends that this evidence is inadmissible as hearsay.  Although Durisseau characterizes this evidence as a "public record[ ]," the court observes that, despite its location on the SEC's website, a proxy statement filed by BNSF does not appear to fit within the hearsay exception for public records.  *See* Fed. R. Evid. 803(8) (explaining that the public records exception applies to "[a] record or statement of a public office if:  (A) it sets out:  (i) the office's activities; (ii) a matter observed while under a legal duty to report . . .; or (iii) in a civil case . . ., factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.").  Ultimately, however, Durisseau's reliance on BNSF's 2009 Proxy Statement is unavailing, as this evidence fails to create a genuine dispute of material fact.

that Union Tank Car received this payment in 2008 fails to demonstrate that it subsequently received such compensation from BNSF or any other railroad.  Without evidence that this compensation was recurring, there is no indication that Union Tank Car continued to receive such payments over a decade later, including in 2020, when Durisseau was injured.  Lastly, the fact that Union Tank Car paid BNSF for "transportation services" in 2008 is immaterial, as an entity's compensation of a railroad is the inverse of *Lone Star*'s fourth prong, which discusses remuneration *from* a railroad *to* the entity defendant.[7]  The court thus agrees with Union Tank Car's assertion that Durisseau fails to demonstrate a financial relationship between Union Tank Car and a common carrier that satisfies the final prong of the *Lone Star* analysis.

As a result, Durisseau has failed to meet his summary judgment burden of proffering competent evidence creating a genuine dispute of material fact on the issue of whether Union Tank Car is a common carrier.  The court concludes that, under the precedent of both *Edwards* and *Lone Star*, Union Tank Car has demonstrated that it is not a common carrier under the FELA as a matter of law.  Summary judgment in Union Tank Car's favor is thus warranted.

III.   Conclusion

In accordance with the foregoing, Union Tank Car's Motion for Summary Judgment (#21) is GRANTED.  Therefore, because Durisseau seeks relief solely pursuant to the FELA and the

---

[7] Durisseau also provides a website link to a rail tariff, RIC 6007-O, that he contends "entitle[s]" the owner of a tank car "to certain remuneration by a participating railway" when the railway uses the owner's tank car.  Notably, Union Tank Car asserts that, in actuality, the tariff permits the *railroad* to charge a tank car owner for the transportation of its empty tank cars.  Union Tank Car also challenges this evidence as inadmissible hearsay.  In any event, Durisseau's reliance on this rail tariff amounts to mere conjecture.  As Union Tank Car points out, Durisseau does not offer evidence of any specific compensation stemming from this tariff.  Durisseau's hypothesis that such compensation might have occurred is little more than "speculation" and "unsubstantiated assertions," which cannot defeat a summary judgment motion.  *Batyukova*, 994 F.3d at 724.

20

court has determined that Union Tank Car is not a "common carrier by railroad" which can be held liable under the FELA, Union Tank Car is entitled to judgment as a matter of law.  A separate order of final judgment in favor of Union Tank Car shall be entered.

SIGNED at Beaumont, Texas, this 25th day of March, 2024.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE